Estate of George Airday v. The City of New York Good morning. May it please the court. Nathaniel Smith for the appellant George Airday. The two jury verdicts rendered in Mr. Airday's favor should be reinstated. There was a question of fact about whether or not Keith Schwamm acted with bad intent. There was a question of whether or not the comparators that Mr. Airday compared himself to were similarly situated. And there was a question of fact about whether or not the parties entered into an implied agreement. The court below did not address the key questions of fact raised by the evidence. The court didn't apply the proper standard. It frankly glided over many of the important facts relevant to both the intent issue and the comparator issue. For example, if Mr. Schwamm's motives were so pure, why would he issue a stop work order shuttering a business that had been operating for 28 years? What did the plaintiff allege was his motive? He clearly felt strongly, but what does the plaintiff allege was the motive and why was it improper? I think that Mr. Schwamm was a member of a law enforcement bureau and that he was accustomed to having his orders, whether they were lawful or not, complied with. And Mr. Airday challenged him in the issuance of these orders that he directed to Mr. Airday, such as the the one that said shutter your business without notice, without opportunity to be ordered, the one that you've been operating for 28 years. So I think that respectfully, I think that Mr. Schwamm was a petty bureaucrat who was tyrannically exercising his ability to punish people who didn't do what he told them to do. If Mr. Schwamm's intent was so pure, why would he issue a suspension order when he had no authority to do so? That was the authority of the first and second departments. Why would he ignore and refuse to even consider mitigating factors? Why would he scuttle the son's application for appointment to city marshal? The son, he admitted, did nothing wrong. Is it an improper motive if he was, if Mr. Schwamm was driven by a belief that Mr. Airday was not following the rules or not being compliant with the legitimate purpose? But like I said, I mean, he scuttled the son's application for reappointment. He admitted that the son didn't do anything wrong. That's pure malice. He did, he punished the son to punish the father, Judge Chin. And there there was no explanation for why that was done. Mr. Schwamm was confronted with it in front of the jury and asked about this and he said nothing. He had no beef was that Mr. Airday had possession of a gun that he was given 30 years ago. He didn't bother to even consider the mitigating factors. If his reasons were act, if he was acting in good faith, why did he destroy Mr. Airday's own reappointment application? Because it would have interfered with his secret plan to terminate, without notice, Mr. Airday's office, one that he had held as a business successfully for 29 years at that point. Why did Mr. Schwamm, if he firmly believed that Mr. Airday was the worst city marshal ever, that he was not fit for office, why wouldn't he tell the first and second department that fact? He didn't want to put anybody on notice about what he was planning to do. He had an obligation to inform the presiding judges of the first and second department that he, if he genuinely felt, which I obviously don't believe, but he had an obligation to tell the court this plan should not be reinstated, but yet he applied successfully. Before you run out of time, yes, the implied contract, what was the implied contract? What was the basis for arguing that there was an implied contract? Thank you. Mr. Schwamm admitted that there was an understanding that once the formal term of office expired, that the marshals, all of them, would continue in their duties. Marshals have hundreds, if not... Continue for how long? Indefinitely? No, no, not indefinitely. There were procedures and protocols and a past practice where the mayor's committee would review, and that's in the Civil Court Act, section 1601 sub 4, where it's the mayor's committee that reviews reappointment applications, looks at the marshals past performance, and makes a recommendation to the mayor about whether or not this application should go forward or not. So... So in practice, people might serve for a long holdover term. Judge, Mr. Airdae served under a term for about 15 years, but about 15 years of his time was in holdover. During Mayor Giuliani's term, nobody at all, 40 or 50, they were all... If they had a five-year term at the beginning of Mayor Giuliani's time as the mayor, they ultimately expired. All of them went at the holdover status. Some of the comparators went at the holdover status. They're still in holdover status today. Can I just ask on the similarly situated point, is there any other comparator, is there any comparator that violated a court order? I mean, because I would think that for a city marshal, they enforce orders of the city court. So, setting mitigating circumstances aside for a moment, the violation of a court order would be pretty significant. I think you're right that none of them violated a court order. One of them, in front of a court, committed perjury, but I don't think that that was like a T.O.P. like we had in the situation. But, you know, the court in Graham and in Who was made clear that similarly situated is not the exact same offense. In this case, that reason makes so much sense because Shane committed serious felonies. He tampered with official records before giving them the DOI, and he tampered with official records on a separate occasion. He was suspended for four months and fined $50,000. Mr. Airday was suspended for a month. He lost his business. It was gone. Mr. Shane, he admitted, these were admitted felonies. Mr. Airday wasn't admitting that he violated intentionally a court order. This was an accident. This was an innocent mistake, and if you look at the facts fairly, you can see that. Schwalm knew it. There's a memo in the file documenting exactly what happened when Mr. Airday was in lockup on a must- situation where he voluntarily opened up his safe, gave the police officer the combination, thinking he had five guns. Okay, he made a mistake. Thirty years ago, when he was a probation officer, another guy gave him a gun because they didn't want to register it. He threw it in his safe, and that's what happened. It's a tragedy, but Schwalm took advantage of it, and he destroyed this business and this man's career for bad faith reasons because he refused to comply with his order, turnover documents protected by the Fifth Amendment, and because he insisted on a process, a statutory process that's laid out in the Civil Court Act. Notice, opportunity, a chance to be heard. Mr. Schwalm didn't want that, and he did everything in his power, not legitimately, but everything in his power to do that, destroying applications. Thank you. I know my time is well over. Thank you, Mr. Smith. Good morning. Mackenzie Fillo for the Appalese. The Constitution did not require the city to reappoint Airday to a law enforcement position where he admittedly violated a court order and had an unregistered firearm for 30 years. On the due process claim, he had no constitutionally protected right to be reappointed. This court has said multiple times that a history of reappointment does not establish a legal entitlement to reappointment. With regards to this so-called contract, there is no evidence that anyone from the city made any promises to him. There's no evidence of what the terms of this contract were. The fact that they, that Mr. Airday cannot explain what the terms were shows that there was no contract. It was clearly the practice to roll marshals over? Most people were permitted to work in holdover status or were reappointed if they wanted to continue. And that does not create an implied contract? Not under this court. Under Schwartz and Hawkins, this court explicitly said that a past practice of reappointment does not establish a legal entitlement, which is what you need. We're talking about constitutional rights here, right? He needed a legal entitlement and he didn't have one. On the selective enforcement claim, after Enquist there is no selective enforcement claim in the government employment context. And I would like to bring this court's attention a case the Supreme Court decided just a week ago called Dupree v. Younger, which said that an issue like this can be raised on appeal even if it was raised at summary judgment and it's a pure legal issue. While under Enquist that was an OLEC claim and this is a Leclerc claim, there's actually a lot of overlap between the claims. If you read Enquist, the court described the claim as an allegation that the person was fired for vindictive and malicious reasons. And that's exactly what Mr. Airday is saying here. And the Supreme Court did not have such a claim. And even if there were such a claim, Airday has no evidence of malice. As Mr. Airday conceded... What about the plaintiff relies on the treatment of the son, the destroying of the application for That's evidence that Schwamm was maybe out to get him, which we have never disputed. Schwamm testified clearly, I want him out. Between being out to get him and malice. It's the reason that he was out to get him. And Airday has no evidence of any improper purpose and it was his burden. This court said in hue just a couple of years ago, it's the plaintiff's burden to prove that the person acted with a malicious intent and an act intended to accomplish a legitimate government objective is not malicious as a matter of law. The only evidence here is that Schwamm was motivated... How is the son part of a legitimate, the treatment of the son's application part of a legitimate government objective? Well, perhaps the son has a claim. But the son is not the plaintiff here. It's not, it doesn't mean that Mr. Airday has a claim. And it certainly doesn't show that Schwamm was out to get Mr. Airday for an improper purpose. And in fact, these people had worked together for 15 years. All the evidence is that they had a good relationship. When Mr. Airday was reappointed in 2009, Mr. Schwamm supported his reapp, his application to be reappointed. And even after the first arrest, Mr. Schwamm did nothing. Because he knew it was he said, she said. It was only after the second arrest that everything changed. That is when Schwamm sent a around with a badge that says City of New York, given the conduct that you admittedly did. And with regard to the comparators, this, Mr. Schwamm was entitled to say that these are qualitatively different kinds of offenses. And that's exactly why Inquis should apply here, is because federal courts are not in the HR department of the City of New York. It is for city to decide whether a particular person's offenses disqualify them from walking around with a city badge. Is it, is it not a jury question for, for the jury to decide whether they were sufficiently similar? This court regularly grants summary judgment or even reverses, overturns jury verdicts on the fact that as a matter of law, things are not sufficiently similarly situated. And even if this court thinks it could go either way on that point, we still win based on malice. And finally, Mr. Schwamm is entitled to qualified immunity. There's no way he could have known about this mysterious contract. Nor could he possibly know that under this selective enforcement theory, that he could not even recommend that Airdrie be fired. Which, or not even fired, just not be reappointed. That his appointment be allowed to expire and that's it. This court has repeatedly described these selective enforcement claims as murky. How could Mr. Schwamm have known the contours of this claim when they are, this court consistently says that they are murky. There's no way he could have known that he couldn't even recommend that Mr. Airdrie be replaced, given his admitted conduct here. Thank you so much. I'll be very quick. In the LeClaire case... Let me ask, what about Enquist? Yes, okay. First of all, Judge Coney, in the second motion for summary judgment, which she raised and asked them to brief, she said there were questions of fact here. And that's a special appendix, page 49, footnote 6. The argument is that the treatment of similarly situated governmental employees, unless there's invidious class-based discrimination. I understand, Judge Trent. I thought the question was, in the Dupree case, the Supreme Court just recently decided, said if there's a pure question of law, then it's not waived. But this is not a pure question of law, and so... Even, the question is this, even assuming there was arbitrary treatment, is that, of similarly situated governmental employees, is that, does that violate the Equal Protection Clause? Yes, it does. But the point I'm trying to make, Judge, is that under Hugh, the class of one theory is an entirely separate pathway for an elective treatment case. And the Hugh case is a building inspector. It's been now twice been gone up to the circuit, first on a motion to dismiss and then on a summary judgment. It was recently affirmed. But nevertheless, the point here is that in the initial Hugh decision by this court, it made clear that there's a difference between the class of one case and a selective treatment case. And that, I laid out in the reply brief, there are myriad reasons why Enquist doesn't apply. This was a regulatory context. It was not an employment context. Mr. Airday was not an employee of the City of New York. He was his own business person. He had clients, judgment creditors. So Enquist doesn't apply for that reason. It also doesn't apply, as Judge Caproni pointed out, because there's a question of fact here about intent. And there also are these waiver issues, because they didn't raise it at trial. They didn't raise it in their post-trial, during their 50A motion at trial or their 50B post-trial. They only raised it now on appeal, asking this court to entertain jurisdiction without any justification for why they didn't raise it. Judge Caproni, as I said, said there are questions of fact here raised by the Enquist argument. I want to say one thing about the clerk, because I was surprised that counsel agreed by saying that Schwamm was out to get Mr. Airday. In the LeClerc case itself, which is a 1980 case, it goes back a ways, yes, 627 F second 606, at 611 it says, the judge says, if Saunders, who was the milk inspector in that case, went after Mr. LeClerc, the plaintiff, to get him, underscore him, for any reason, then he should be liable. That's exactly, that's exactly what this record shows Mr. Schwamm did. Relentlessly, likely minutes, two years, anything and everything possible. There's no qualified immunity. This was not an innocent mistake. Thank you very much. Thank you both, and we'll take the matter under advisement.